***FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER***

**Electronically Filed
Supreme Court
SCWC-29539
07-JUN-2013
10:42 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

SHILO WILLIS, Petitioner/Plaintiff-Appellant,

vs.

CRAIG SWAIN, FIRST INSURANCE COMPANY OF HAWAIʻI, LTD.,
Respondents/Defendants-Appellees.

SCWC-29539

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 29539; CIV. NO. 01-1-0467)

June 7, 2013

RECKTENWALD, C.J., NAKAYAMA, ACOBA, AND MCKENNA, JJ.,
WITH CIRCUIT JUDGE CHANG, ASSIGNED DUE TO VACANCY,
CONCURRING AND DISSENTING

OPINION OF THE COURT BY ACOBA, J.

We hold that (1) under the assigned claims procedure of the State of Hawaiʻi Insurance Joint Underwriting Program (JUP), see Hawaiʻi Revised Statutes (HRS) § 431:10C-408 (Supp. 1998), the insurer assigned to a claim owes the same rights and obligations to the person whose claim is assigned to it as the insurer would owe to an insured to whom the insurer had issued a

motor vehicle mandatory public liability and property insurance policy, HRS § 431:10C-403 (Supp. 1998); (2) the insurer's good faith covenant implied in such motor vehicle policies applies to claimants under the assigned claim procedure irrespective of the absence of a written insurance policy; (3) accordingly, Petitioner/Plaintiff-Appellant Shilo Willis (Petitioner), who was assigned by the JUP Bureau to Respondent/Defendant-Appellee First Insurance Company of Hawai'i, Ltd. (Respondent) under the assigned claim procedure, was owed a duty of good faith by Respondent; and (4) whether Respondent acted in bad faith in this case as alleged by Petitioner is a question of fact to be determined by the trier of fact.  Therefore, we vacate the December 11, 2008 Final Judgment of the Circuit Court of the First Circuit (the court)[1] and the March 9, 2012 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its February 3, 2012 published opinion in Willis v. Swain, 126 Hawai'i 312, 270 P.3d 1042 (App. 2012) (Willis III),[2] affirming the court, because both reflect holdings to the contrary.  We remand this case to the court for proceedings consistent with this opinion.

                              I.

         On February 10, 1999, Petitioner was a passenger in an uninsured vehicle that rear-ended another vehicle.  The uninsured

_____

[1]    The Honorable Eden Elizabeth Hifo presided.

[2]    The opinion was filed by Chief Judge Craig H. Nakamura, and Associate Judges Katherine G. Leonard and Lisa M. Ginoza.

                              2

vehicle was owned and operated by Craig Swain.  At the time of the accident, Petitioner, a public assistance recipient, owned her own vehicle, and had a certificate policy issued by the State of Hawaiʻi Department of Human Services (DHS) through its JUP. Respondent was designated to adjust the certificate policy.

The certificate policy was in effect from July 2, 1998 through July 2, 1999, but did not include uninsured motorist coverage.  Petitioner sought medical treatment for injuries resulting from the collision.  <u>Willis v. Swain</u>, 112 Hawaiʻi 184, 187 n.6, 145 P.3d 727, 730 n.6 (2006) (<u>Willis I</u>).[3]  On July 21, 1999, Petitioner applied for assigned claims coverage under the JUP.  On August 11, 1999, the JUP Bureau[4] determined that Petitioner was entitled to receive benefits available under JUP, and assigned Petitioner's claim to Respondent.  On December 28, 1999, Respondent denied Petitioner's request for coverage on the ground that, at the time of the accident, Petitioner had a

---

[3]     It appears that, as a recipient of public assistance, at least some of Petitioner's medical expenses were paid by DHS.  <u>Willis I</u>, 112 Hawaiʻi at 187 n.6, 145 P.3d at 730 n.6.

[4]     The Joint Underwriting Plan Bureau is established pursuant to HRS § 431:10C-402 (1993), which provides:

> **§ 431:10C-402.  Bureau**.  (a) The commissioner shall establish and maintain a joint underwriting plan bureau in the insurance division to receive, assign and supervise the servicing of all assigned claims and all applications for joint underwriting plan coverage.
>       (b) The commissioner shall adopt regulations for the operation of the bureau, the assignment of <u>applications for joint underwriting plan coverage</u> and <u>assigned claims</u>, and the inspection, supervision and maintenance of this service on a fair and equitable basis in accordance with this article.

(Emphases added.)

certificate policy and that policy did not include uninsured motorist coverage.

On February 9, 2001, Petitioner sued Respondent for breach of contract, bad faith refusal to pay liability coverage, misrepresentation, unfair claims practices, and unfair or deceptive acts or practices in violation of HRS § 480-2 (1993).[5] On May 6, 2003, the court entered summary judgment in favor of Respondent with respect to all of Petitioner's claims. This court reversed and remanded for Respondent to "tender the appropriate benefits under the assigned claims program." Willis I, 112 Hawaiʻi at 191, 145 P.3d at 734. Respondent paid Petitioner the bodily injury liability policy limit of $20,000.

Subsequently, Petitioner requested attorneys' fees and costs as the prevailing party in Willis I. Willis v. Swain, 113 Hawaiʻi 246, 151 P.3d 727 (2006) (Willis II). This court held that Petitioner was not entitled to attorneys' fees, but that she should be awarded costs. Id. at 250, 151 P.3d at 731.

On June 8, 2007, Petitioner filed a motion to compel Respondent to answer Petitioner's interrogatories, and to respond to Petitioner's requests for production of documents. On June 28, 2007, Respondent moved for summary judgment with respect to Petitioner's remaining claims for breach of contract, bad faith, misrepresentation, unfair claims practices, and unfair or

---

[5]     Petitioner did not raise the HRS § 480-2 claim in her appeal to the ICA or in her Application for Writ of Certiorari (Application), and therefore this statute is not relevant to this appeal and is not quoted.

4

deceptive acts or practices in violation of HRS § 480-2. Petitioner did not move for summary judgment, but filed an opposition to Respondent's motion.

As to Petitioner's bad faith claim, Respondent argued, in relevant part, that under Hawaiʻi law there is no bad faith if an insurance company denies benefits based on a reasonable interpretation of the policy or based on an open question of law. Respondent contended that the fact that the court had previously granted summary judgment to it on the merits of Petitioner's claim for benefits (a decision ultimately reversed in Willis I) demonstrated that there was reasonable disagreement over the interpretation of the law as applied to the facts of this case. Thus, Respondent urged, there was an open question of law and Petitioner had no basis to pursue its bad faith claim.

Petitioner answered that whether Respondent had acted unreasonably was a question of fact, and as such, was not the proper subject of a motion for summary judgment. Petitioner also argued that if an insurer honestly believes that its policy does not provide coverage, it must bear the risk of making the wrong judgment. Petitioner noted that this court in Willis I had criticized Respondent's argument, calling it "absurd," and thus, whether Respondent acted reasonably when it denied benefits on an irrational argument was a question of fact that precluded summary judgment.

Additionally, Petitioner argued that because Respondent had not answered some of Petitioner's interrogatories,

5

produced requested documents, or allowed Petitioner to depose its claims adjusters, Petitioner's expert, a former adjuster for the JUP program for another insurance company, was unable to fully evaluate whether Respondent had denied coverage in bad faith. However, the expert averred in an affidavit submitted along with Petitioner's opposition, that according to his reading of Willis I and the practice of the insurance industry, Respondent had unreasonably denied coverage to Petitioner.

On August 20, 2007, Respondent filed supplemental memorandum in support of its motion for summary judgment, and Petitioner filed a supplemental memorandum in opposition to the motion for summary judgment. Attached to Petitioner's Reply to Respondent's Supplemental Legal Memorandum was another affidavit from Petitioner's expert. In the affidavit, Petitioner's expert averred:

> 1. I reviewed the documents which were produced to [Petitioner] in response to [Petitioner's] request for production of documents relating to [Respondent's] denial of benefits.
> 2. Based on the review of the above documents, it is my professional opinion that [Respondent] unreasonably denied the JUP assigned claim benefits to [Petitioner].
> 3. [Respondent] unreasonably denied the JUP assigned claim benefits because it did not, among other things, have any legal basis to deny said benefits.
> 4. The above-referenced records produced by [Respondent] also do not show that a sufficient investigation was undertaken by [Respondent] in connection to its denial of the JUP assigned claim benefits.
> 5. [Respondent] unreasonably and wrongfully denied the assigned claim when it unilaterally confused the purpose and application of a certificate policy and an assigned claim, which are separate and apart from one another.
> 6. Within the insurance industry and community, it is common knowledge and understood that a certificate policy does not negate a JUP assigned claim.
> 7. [Respondent] owed [Petitioner] a duty of good faith and fair dealing, as the insurance company who was assigned to adjust the JUP assigned claim by the State of Hawaiʻi under the [JUP].

6

> 8. To the extent that the JUP assigned claims, essentially, operates as an insurance relief measure and is a substitute to the mandated automobile bodily injury coverage requirements of the State of Hawaiʻi, [Respondent's] duty of good faith and fair dealing arises from [Respondent's] assigned role as a servicing carrier and an insurer under the [JUP], and as such does not depend, necessarily, on whether [Petitioner] was a party to any written contract.
>
> 9. [Respondent breached its duty of good faith and fair dealing when when [sic] it unreasonably and wrongfully denied [Petitioner] the JUP assigned claim benefits.
>
> 10. The above opinions are preliminary and subject to change whenever further documents are produced by [Respondent] and/or other facts are developed through further discovery in the underlying lawsuit against [Respondent].

(Emphases added.)

On October 3, 2007, the court granted Respondent's motion, concluding, in relevant part, that there was no contract of insurance between Petitioner and Respondent, and thus, there could be no cognizable claim of bad faith in the absence of a contract. The court further concluded that the published opinion of this court in Willis I settled an open question of law and therefore pursuant to Enoka v. AIG Hawaiʻi Ins. Co., 109 Hawaiʻi 537, 128 P.3d 850 (2006), there was no bad faith on Respondent's part.[6] The court also granted Respondent's motion for summary

---

[6] The court's order stated, in relevant part:

It is undisputed that [Respondent] has paid all benefits that [Petitioner] is entitled to recover as an assigned claims claimant under the [JUP] pursuant to and in compliance with the Supreme Court's opinion in this case. By this Order this Court hereby grants summary judgment in favor of [Respondent] and against [Petitioner] with respect to all remaining claims alleged against [Respondent] in this action, including, without limitation, any claim for breach of contract, misrepresentation, negligent or intentional infliction of emotional distress, unfair claims practices, unfair or deceptive acts [or] practices in violation of [HRS] §480-2 or bad faith. With respect to [Petitioner's] bad faith claim this Court concludes as a matter of law that there is no cognizable claim for bad faith in the absence of a contract. This Court further finds that the published

(continued...)

judgment with respect to the remainder of Petitioner's claims. Upon granting Respondent's motion for summary judgment, the court held that Petitioner's motion to compel was moot and denied it.

## II.

On Petitioner's appeal to the ICA,[7] the ICA held that an underlying insurance contract was required in order to assert a claim of bad faith against an insurer, and because Petitioner's claims did not arise from an insurance contract, the court did not err in granting summary judgment on Petitioner's bad faith claim.[8]  Willis III, 126 Hawaiʻi at 315-17, 270 P.3d at 1045-47. In light of that holding, the ICA declined to address whether the court erred in concluding that Respondent did not act in bad faith.  Id.  The ICA also concluded that in light of its holding that no bad faith claim could lie against Respondent, the court

---

[6](...continued)
opinion of the Hawaiʻi Supreme Court in this case settled an open question of law and therefore pursuant to the Hawaiʻi Supreme Court's opinion under analogous circumstances in Enoka v. AIG Hawaiʻi Ins. Co., Inc., 109 Hawaiʻi 537, 128 P.3d 850 (2006), there was no bad faith on the part of [Respondent].

(Emphasis added.)

[7]    Petitioner expressly stated in her opening brief to the ICA that she was not appealing the court's decision to dismiss her claims for breach of contract, misrepresentation, and unfair claims practices.  Petitioner mentioned her emotional distress claim to the ICA in her points of error, but did not make any argument to the ICA as to that claim.  As a result, the ICA held that any argument regarding the court's dismissal of such a claim had been waived.  Willis III, 126 Hawaiʻi at 314, 270 P.3d at 1044.  Petitioner does not take issue with that holding in her Application.

[8]    In addition, Petitioner argued that she could bring a bad faith claim against Respondent because she was an intended beneficiary of the JUP program.  Petitioner does not assert this theory in her Application, and therefore this theory is not addressed further.

properly denied Petitioner's motion to compel.  Willis III, 126 Hawaiʻi at 317, 270 P.3d at 1047.

III.

Petitioner presents the following questions in her Application:

> [1.]  Whether the ICA correctly decided that [Respondent] did not owe a duty of good faith <u>in the absence of a contractual relationship when HRS § 431:10C-403 specifically and clearly states that an assignee insurance company has the same obligations as though it had sold the policy.</u>
> [2.]  Whether [Respondent] owed [Petitioner] a duty of good faith pursuant to its insurer and insured relationship regardless whether [Petitioner] purchased a conventional motor vehicle insurance policy from [Respondent].
> [3.]  Whether it is rational to exempt Hawaiʻi insurance companies from acting in good faith when adjusting [JUP] assigned claims when they have an independent duty implied in law to act in good faith as fiduciaries with their insureds.

(Emphasis added.)

IV.

In 1973, Hawaiʻi overhauled its insurance law and created a no-fault insurance scheme to govern motor vehicle accident reparations.  Chapter 294 was enacted in order to "create a system of reparations for accidental harm and arising from motor vehicle accidents, to compensate these damages without regard to fault, and to limit tort liability for these accidents."  HRS § 294-1(a) (1974).  According to the legislature, the "system of no-fault insurance can only be truly effective . . . if all drivers participate at least to the extent required by law"  HRS § 294-1(b) (1974).  For those persons "truly economically unable to afford insurance, the legislature

9

. . . provided for them under the public assistance provisions of [Chapter 294]." Id.

In 1974, the public assistance provisions of the plan, located in HRS §§ 294-20 through -23, were repealed and replaced with the JUP, HRS §§ 294-20 to -24 (1974).  The JUP plan required all insurers authorized to write insurance in Hawaiʻi to maintain membership in the plan.  HRS § 294-20.  The insurance commissioner was required to establish classifications of eligible persons for whom the JUP would provide no-fault policies and any additional coverage.  HRS § 294-22.

In 1987, Hawaii's motor vehicle insurance law was again overhauled with the repeal of Chapter 294 and enactment of Article 10C of Chapter 431.  The purpose of Article 10C was to

> (1)    Create a system of reparations for accidental harm and loss arising from motor vehicle accidents;
> (2)    Compensate these damages without regard to fault; and
> (3)    Limit tort liability for these accidents.

HRS § 431:10C-102 (Supp. 1997).  To encourage participation by all drivers, uninsured drivers were dealt with more severely in criminal and civil areas, and those who were unable to afford insurance were provided for under the JUP.  Id.

The JUP was incorporated into Article 10C under HRS §§ 431:10C-401 through -412.  The JUP has two options for coverage. The first allows individuals to obtain certificate policies, HRS § 431:10C-407 (Supp. 1999), which are "intended to provide motor vehicle insurance and optional additional insurance in a

10

convenient and expeditious manner for . . . persons who otherwise are in good faith entitled to, but unable to obtain, motor vehicle insurance through ordinary methods."  Hawaiʻi Administrative Rules (HAR) § 16-23-67(a) (1999).  The second, the "assigned claims" program, allows individuals to obtain coverage even if they do not have a certificate policy.  HRS § 431:10C-408.  The assigned claims program "consists of the assignment . . . of claims of victims for whom no policy is applicable, such as the hit-and-run victim who is not covered by a motor vehicle insurance policy."  HAR § 16-23-67(b).

For certificate policies, the DHS must provide a certificate of eligibility for JUP coverage to eligible licensed drivers and unlicensed permanently disabled individuals unable to operate their motor vehicle, who are receiving public assistance and who desire basic motor vehicle insurance coverage under the JUP.[9]  HAR § 16-23-73(a) (1999).  The applicant then submits the certificate to the servicing carrier of the applicant's choice for a motor vehicle insurance policy.  Id.  Certificates received by the servicing carrier within thirty days from the date of certification eligibility by DHS "shall be accepted and treated as if it were payment in full" for a policy.  Id.  The servicing carrier must then "certify this certificate which will function

---

[9]     These licensed drivers and unlicensed permanently disabled individuals unable to operate their motor vehicle must be the sole registered owners of the motor vehicles to be insured under the JUP.  HAR § 16-23-73(a).

11

as a motor vehicle insurance policy and issue the applicant a motor vehicle insurance identification card."[10]  Id.

In contrast, under the assigned claims program "a person sustaining accidental harm, or such a person's legal representative," (except as provided in another subsection) may obtain motor vehicle insurance benefits through the plan whenever:

> (1)   No insurance benefits under motor vehicle insurance policies are applicable to the accidental harm;
> (2)   No such insurance benefits applicable to the accidental harm can be identified; or
> (3)   The only identifiable insurance benefits under motor vehicle insurance policies applicable to the accidental harm will not be paid in full because of financial inability of one or more self-insurers or insurers to fulfill their obligations.

HRS § 431:10C-408(a).[11]

Insurers operating in Hawaiʻi are required to participate in the JUP (with some exceptions).  HAR § 16-23-68(a)

---

[10]   The rest of HAR § 16-23-73 provides:

The servicing carrier shall develop the information necessary to validate the eligibility of the applicant. Only basic motor vehicle insurance policy coverages, as defined in sections 16-23-4, 16-23-5, and 16-23-9, shall be bound, and the effective date of coverage shall be the same date as the signature date on the certificate by the applicant; however, the effective date shall not precede the time and date of the certification of eligibility by the state department of human services, the date that the servicing carrier receives the certificate, or the second day after postmark, whichever is later.  In the event that the applicant fails to date the certificate, the date that the servicing carrier receives the certificate or the second day after postmark, whichever is earlier, shall be considered the date the applicant signed the certificate. The servicing carrier shall promptly notify the director of human services of public assistance recipients which it insures.

[11]   In 2001, HRS § 431:10C-408(a)(1) was amended by adding the following underscored language: "(1) No liability or uninsured motorist insurance benefits under motor vehicle insurance policies are applicable to the accidental harm . . . ."  The amendment is not material to this dispute.

(1999).   Under the program, insurers "pool their losses and bona fide expenses . . . to prevent the imposition of any inordinate burden on any particular insurer."  HAR § 16-23-68(a).  "All costs incurred in the operation of the [JUP], such as administrative, staff, and claims (other than assigned claims) paid, shall be allocated fairly and equitably among the JUP members."  HAR § 16-23-70 (1999).  Losses and expenses "under the assigned claims program are pro-rated among and shared by all motor vehicle insurers and self-insurers."  HAR § 16-23-67(b).  Every year, the commissioner "prorate[s] among and assess[es] all insurers and self-insurers all costs and claims paid under the assigned claims program."  HAR § 16-23-85 (1999).

The JUP also specifies the duties of insurers participating in the program.  Under HRS § 431:10C-403, the JUP Bureau "shall promptly assign each claim and application, and notify the claimant or applicant" of the identity of the assignee insurer.  (Emphasis added.)  Importantly,

> [t]he assignee, thereafter, has rights and obligations as if it had issued motor vehicle mandatory public liability and property damage policies complying with this article applicable to the accidental harm or other damage, or, in the case of financial inability of a motor vehicle insurer or self-insurer to perform its obligations, to perform its obligations as if the assignee had written the applicable motor vehicle insurance policy, undertaken the self-insurance, or lawfully obligated itself to pay motor vehicle insurance benefits.

Id. (emphasis added).

## V.

The law of insurance fits largely within two domains. 1 New Appleman on Insurance Law Library Edition § 1.04 (Jeffrey E. Thomas, ed., 2011) (hereinafter Appleman).  The first involves

13

the regulation of insurers, and is generally accomplished through statutes enacted by state legislatures and administrative regulations issued by state agencies. Id. The second involves regulation of the insured-insurer relationship, and for the most part consists of judicially-articulated rules. Id. This latter realm of insurance law largely overlaps with contract law because the insurance arrangement is usually articulated in a contract. Id. However, even if insurance law is generally understood as a specialized application of contract law, other bodies of law are also pertinent to its application. Id. Doctrines developed in contract law to facilitate the formation of agreements between parties negotiating at arms length have been adapted and expanded by incorporating principles from other areas of law in order to regulate the special relationship between policyholders and insurers.[12] See id. Thus, "tort law as expressed through the

---

[12]    For example, as explained in Appleman § 5.01:

Courts interpreting insurance policies often start from the premise that an insurance policy is a contract, and therefore the rules of contract interpretation apply. While at first blush this axiom seems true enough, insurance policies do not fit the traditional contract model very well. For example, the traditional contract model is not very helpful when it comes to the question of interpretation. Insureds do not generally have sufficient control or information to develop a specific intention about what is covered by their policy. Insurance policies are almost always standardized forms offered on a take-it-or-leave-it basis. As a result the assumption that a court engaged in the interpretation of an insurance policy will determine the "intention" of the parties when they "made" the contract is a fiction. While courts say they are looking for the intention of the parties, in reality they are making a judgment about the scope of coverage based on the text of the policy, the circumstances, and public policy[.]

(continued...)

law of bad faith is highly relevant to the regulation of the insurer-insured relationship."  Id.

VI.

Broadly speaking, in first-party insurance, "the contract between the insurer and the insured indemnifies the insured for a loss suffered directly by the insured."  Appleman § 1.08[3].  Proceeds are paid to the insured to redress the insured's loss.  Id.  Liability insurance, on the other hand, is described as third-party insurance because the interests protected by the policy are ultimately those of third parties injured by the insured's conduct.  Id.  For example, if the insured negligently insures a third party, the third party will possess a claim against the insured.  Id.  If the claim is reduced to a judgment, the insured will suffer a loss.  Id.  The liability insurer will reimburse the insured for any liability the insured may have to the third party, but in the event of payment, the insured simply transfers the proceeds from the insurer to the third party.  Id.

One kind of insurance that appears to straddle the first-party and third-party categories is uninsured motorist insurance.  Id.  As Appleman explains, after states began to require that operators of automobiles carry liability insurance for the purpose of compensating the victims of automobile

_____

[12](...continued)
(Emphases added.)

15

accidents, "it became apparent that no mandatory system of liability insurance could compensate all of the situations in which persons were injured in vehicular accidents." This led insurers to market uninsured motorist coverage, "which is essentially a first-party coverage where the insurer's obligation is defined by the scope of a third party's obligation to its own insured." Id. (emphasis added). In other words, under uninsured motorist coverage, the insured pays a premium to his own insurer for coverage in the event a financially irresponsible or unknown person is legally responsible for the insured's injury. Id.

The assigned claims plan under JUP, which, as noted, allows persons to procure coverage when (1) no benefits are applicable to the accidental harm; (2) no benefits applicable to the harm can be identified; and (3) the only identifiable benefits will not be paid in full because of the financial inability of the insurer to fulfill its obligations, HRS § 431:10C-408(a), essentially fulfils the same goals as first-party uninsured motorist coverage.[13]

VII.

In Best Place, Inc. v. Penn America Insurance Co., 82 Hawaiʻi 120, 920 P.2d 334 (1996), this court first recognized the tort of bad faith refusal to pay a valid insurance claim in the

---

[13] This opinion concerns provisions relating to no fault insurance provisions under Chapter 431:10C relating to Motor Vehicle Insurance. It does not pertain to other statutory relationships, dissenting opinion at 3 n.3, or the "family law area[,]" dissenting opinion at 22 n.16, as the dissent suggests, and following the precepts of precedent would not afford a harbor for "zealous advocate," as the dissent suggests. Dissenting opinion at 3 n.3, 12 n.11.

16

first-party insurance context.  In that case, the insured, Best Place, insured a nightclub under a policy issued by Penn America.  Id.  A fire broke out and destroyed the nightclub.  Id.  Penn America suspected arson and refused to pay the proceeds that would have been due under the policy.  Id.  Best Place sued Penn America, alleging breach of contract and tortious breach of the implied covenant of good faith and fair dealing.  Id.

Best Place considered whether Hawaiʻi would allow a tort claim for bad faith against an insurer.[14]  Id.  According to this court, the Hawaiʻi legislature had recognized that the insurance industry affects the public interest, and, therefore, insurers are obligated to act in good faith.  Id. at 125-26, 920 P.2d at 338-40 (citing HRS § 431:1-102 (1993)).[15]  The duty to act in good faith was consistent with other statutory provisions

---

[14]    In Best Place, this court looked to California decisions that "led the way in the modern development of the bad faith cause of action for insurer misconduct."  Best Place, 82 Hawaiʻi at 127, 920 P.2d at 341.  This court noted that the Supreme Court of California's decision in Gruenberg v. Aetna Ins. Co., 510 P.2d 1032 (Cal. 1973), "established that the defendant's duty of good faith and fair dealing, implied by law, is unconditional and independent of the performance of plaintiff's contractual obligations," and that "insurance companies owe an absolute duty of good faith and fair dealing to their insureds."  Best Place, 82 Hawaiʻi at 128; 920 P.2d at 342 (citing Gruenberg, 510 P.2d at 1040) (emphasis in original).  In Gruenberg it was established that when an insurer fails to deal fairly and in good faith with its insured "by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." 510 P.2d at 1037.

[15]    HRS § 431:1-102 provides in relevant part:

The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters.  Upon the insurer, the insured and their representatives rests the duty of preserving inviolate the integrity of insurance.

(Emphasis added.)

17

that contemplated a cause of action for insurer bad faith.  Id.
at 126, 920 P.2d at 340.  For example, in the no-fault insurance
context, HRS § 431:10C-315 (1993)[16] sets forth the applicable
statute of limitations for a bad faith cause of action against an
insurer.  Best Place, 82 Hawaiʻi at 126, 920 P.2d at 340.

This court held that there was a legal duty, implied in
first and third-party insurance contracts, requiring the insurer
to act in good faith in dealing with insureds, and a breach of
that duty of good faith gave rise to an independent cause of
action in tort.  Id. at 131-32, 920 P.2d at 345-46.  Although
repeatedly alluding to the existence of a contractual
relationship between the insurer and insured, this court grounded
bad faith tort claims on the special relationship between
insurers and their insureds.  See id.  It was reasoned that the
tort of bad faith is not merely a tortious breach of contract,
"but rather a separate and distinct wrong 'which results from the
breach of a duty imposed as a consequence of the relationship
established by contract.'"  Id. at 131, 920 P.2d at 345 (citation
omitted) (emphasis added).  Hence, there were sound reasons "for

---

[16]   HRS § 431:10C-315 provides in relevant part:

> **Statute of limitations**. (a) No suit shall be brought
> on any contract providing no-fault benefits or any contract
> providing optional coverage more than, the later of
> . . . .
>
> (4) Two years after the entry of a final judgment in,
> or dismissal with prejudice of, a tort action arising out of
> a motor vehicle accident, where a cause of action for
> insurer bad faith arises out of the tort action.

(Emphasis added.)

18

recognizing a cause of action in tort for breach of the implied covenant of good faith and fair dealing in the insurance context." Id. at 132, 920 P.2d at 346. Specifically, the special relationship between insurer and insured was "atypical, and the adhesionary aspects of an insurance contract . . . justif[ied] the availability of tort recovery." Id. Finally, a bad faith cause of action would provide the necessary compensation to the insured for all damages suffered as a result of insurer misconduct. Id. Without the threat of a tort action, insurance companies had "very little incentive to promptly pay proceeds rightfully due to their insureds, as they stand to lose very little by denying payment." Id.

## VIII.

The reasoning articulated in Best Place supports Petitioner's contention that she can pursue a bad faith tort claim in connection with her assigned claim. To begin, the legislature incorporated specific language in the JUP statutes concerning the rights and obligations of insurers under the JUP. As noted, in HRS § 431:10C-403, the legislature stated:

> The bureau shall promptly assign each claim and application, and notify the claimant or applicant of the identity and address of the assignee of the claim or application. Claims and applications shall be assigned so as to minimize inconvenience to claimants and applicants. The assignee, thereafter, has rights and obligations as if it had issued motor vehicle mandatory public liability and property damage policies complying with this article applicable to the accidental harm or other damage . . . .

The first two sentences prescribe the process that the JUP Bureau must follow. But the language that follows sets

19

forth, not the JUP Bureau's responsibilities, but those of the servicing carrier. Inasmuch as HRS § 431:10C-403 imposes obligations on the insurer as if it had issued a motor vehicle policy, the statute establishes a relationship between the insurer and the assigned claimant that is akin to a contract. As such, the underlying covenant of good faith and fair dealing applies, even in the absence of an actual contract. In other words, the legislature imposed a duty of good faith and fair dealing on insurers handling assigned claims by equating the relationship between an insurer and an assigned claimant to the contractual relationship between an insurer and an insured. This legislative goal is also manifest in HRS § 431:1-102. Best Place, 82 Hawaiʻi at 125-26, 920 P.2d at 339-40 ("The Hawaiʻi [l]egislature has recognized that the insurance industry affects the public interest, and, therefore, insurers are obligated to act in good faith.") (citing HRS § 431:1-102). The legal basis for imposing a duty of good faith and fair dealing on insurers is thus set forth by statute. Consequently, by virtue of HRS § 431:10C-403, an insurer's "obligations" would include dealing with the insured in good faith.

When construing a statute, the foremost obligation of this court is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. State v. Reis, 115 Hawaiʻi 79, 84, 165 P.3d 980, 985 (2007). This court reads the "statutory language in the context of the entire statute and

20

construe[s] it in a manner consistent with its purpose."[17]  Id.
Since an insurer's obligations toward an insured include a duty
to act in good faith, see Best Place, 82 Hawaiʻi at 125-26, 920
P.2d at 339-40 (citing HRS § 431:1-102), the insurer's "rights
and obligations" under the JUP must necessarily incorporate a
duty of good faith toward the person whose claim has been
assigned to the insurer.  For all intents and purposes, that
person becomes an "insured" once his or her claim has been
assigned to the insurer.[18]

IX.

The differences in statutory language applicable to the
certificate policy program and the assigned claims program, i.e.,
that a certificate policy is "deemed a policy" for purposes of
the statute, while insurers who service assigned claims have
"rights and obligations as if [they] had issued motor vehicle
mandatory public liability and property damage policies[,]" do
not reflect an intent by the legislature to impose a duty of good
faith on the former category of insurers, but not the latter.  To
the contrary, the different language reflects the fact that the

---

[17]  Accordingly, "policy-making" is not involved, as the dissent
contends, dissenting opinion at 8-9 n.8, inasmuch as this court applies the
plain language of the statute.  Dejetley v. Kahoʻohalahala, 122 Hawaiʻi 251,
262, 226 P.3d 421, 432 (2010).  The dissent's assertion that the legislature
did not expressly deem an assigned claim to include a contract, see dissenting
opinion at 10-11 n.10, 21-24, is negated by the express provisions of the
referenced interrelated statutes, which plainly express a legislative policy
by which this court, in the exercise of its interpretive role, must be guided.

[18]  That "[t]he parties have not cited" to similar "cases from any
jurisdiction," see dissenting opinion at 4 n.6, is not a valid objection
inasmuch as the dissent cites to no contrary case and, here, we interpret a
particular statute from our jurisdiction.

two programs deal with factually different circumstances.  The certificate program establishes a mechanism under which drivers who cannot afford insurance are provided coverage so that they can lawfully operate motor vehicles.  See HRS §§ 431:10C-104(a) and (b) (Supp. 1997); HAR § 16-23-73(a).  HRS § 431:10C-104(a) provides in relevant part, that "no person shall operate or use a motor vehicle upon any public street, road, or highway of this State at any time unless such motor vehicle is insured at all times under a motor vehicle insurance policy."  (Emphasis added.) HRS § 431:10C-104(b) provides, "Every owner of a motor vehicle used or operated at any time upon any public street, road, or highway of the State shall obtain a motor vehicle insurance policy upon such vehicle which provides the coverage required by this article and shall maintain the motor vehicle insurance policy at all times for the entire motor vehicle registration period."  See also HRS § 431:10C-103 (Supp. 1998) ("'Motor vehicle insurance policy' means an insurance policy that meets the requirements of [HRS §] 431:10C-301.");  HRS § 431:10C-301 (Supp. 1998) (setting forth the required insurance policy coverage for a motor vehicle).  Accordingly, it is reasonable to refer to those individuals under the certificate program as having a "policy," which satisfies the requirements of the no fault law.

In contrast, the assigned claims program addresses a different category of persons, i.e., individuals who have already been involved in an accident, and whose entitlement to lawfully

22

operate a motor vehicle in the future is not at issue. See HRS §
431:10C-408(a) (determining that benefits under the assigned
claims program are applicable to "[e]ach person sustaining an
accidental harm, or such person's legal representative"); see
also HAR § 16-23-67(b) ("Another part of the JUP consists of the
assignment thereto of claims of victims for whom no policy is
applicable, such as the hit-and-run victim who is not covered by
a motor vehicle insurance policy."). Rather, the question is
whether the claimant will be covered for an accident that has
already occurred. HRS § 431:10C-408(a). The language employed
by the legislature -- that the insurer assigned to handle such
claims has the same rights and obligations as if it had issued a
policy -- appropriately addresses that differing context and
reflects a clear legislative intent that such claimants are
entitled to the same protections as policyholders, including
having their claim considered in good faith.[19]

---

[19] Consequently, HRS § 431:10C-403 deems that an assigned claim
claimant is to be treated as if the assignee had issued the claimant a "motor
vehicle . . . polic[y][.]" Further, as confirmed in HRS § 431:1-102, the
relationship is imbued with a good faith obligation, inasmuch as in the
business of insurance, all persons are "requir[ed]" to be "actuated by good
faith[.]" Accordingly, the existence of an "actual contract of insurance,"
dissenting opinion at 7, is not required. Also, contrary to the dissent's
position, see dissenting opinion at 8, the "express" reference to "policy,"
like that found in HRS § 431:10C-407(b)(2)(B), is not necessary in HRS §
431:10C-403 in light of equivalent statutory language in HRS §§ 431:1-102 and
431:10C. Thus, contrary to the dissent's assertion that this conclusion
represents a leap, see dissenting opinion at 10-11 n.10, or "that the
legislature did not expressly deem an assigned claim to be based upon an
insurance policy," see dissenting opinion at 20 n.14, this conclusion is
mandated by the express statutory language providing that insurers who service
assigned claims have "rights and obligations as if [they] had issued motor
vehicle mandatory public liability and property damage policies. . . ." HRS §
431:10C-403 (emphasis added).

X.

Moreover, to hold that an insurer does not owe a duty of good faith toward persons whose claims have been assigned to the insurer under the assigned claims portion of the JUP would also contravene public policy. As stated in Best Place, one of the reasons for allowing insureds to sue their insurers for bad faith is to ensure the insured receives the necessary compensation for all damages suffered as a result of insurer misconduct. 82 Hawaiʻi at 132, 920 P.2d at 346. The denial of claims in bad faith does not cease to be misconduct simply because the insured has not purchased a policy, but, rather is entitled to coverage pursuant to a state program that specifically requires insurers to provide such coverage. The legislature intended for persons who qualify to have coverage under the JUP assigned claims program, and an insurer's bad faith denial of such claims undermines the statutory scheme, resulting in damages to the person whose claim has been improperly denied. A bad faith tort claim would allow recovery in cases of insurer misconduct.[20]

_____

[20] The dissent argues that assigned claimants are not necessarily public assistance eligible, and therefore, may not be entitled to as much protection against bad faith conduct as certificate policy holders. See dissenting opinion at 9-10. However, assigned claimants are, by definition, persons who have no other coverage available. Specifically, they are persons who have "no insurance benefits under [a] no-fault polic[y]," or for whom "no such insurance benefits applicable to the accidental harm can be identified," or for whom "[t]he only identifiable insurance benefits under no-fault policies applicable to the accidental harm will not be paid in full . . . ." HRS § 431:10C-408.

As noted before, an example of assigned claimants are those "victims for whom no policy is applicable, such as the hit-and-run victim who is not covered by a motor vehicle insurance policy." HAR § 16-23-67(b). It
(continued...)

Another reason cited in Best Place for allowing bad faith tort claims is the possibility that without the threat of a tort action, insurance companies have very little incentive to promptly pay proceeds, as they stand to lose very little by delaying payment. Id. That rationale may apply in this context. As noted, insurers are required to participate in the JUP as a condition of doing business in Hawaiʻi. It appears that losses and expenses are pro-rated among and shared by all participating insurers. See HAR § 16-23-68(b). It is unclear whether these costs are passed on to the public in the form of higher insurance rates, or whether the state provides some other form of compensation to insurers.[21]

If every claim that is paid out under the assigned claims program results in an immediate loss that is shared among participating insurers, and these losses are not offset by the

_____

[20](...continued)
is unlikely that the legislature believed hit-and-run victims without insurance had much in terms of resources at their disposal, and yet, created a program to provide last resort coverage for those individuals. Indeed, the idea that assigned claimants do not need protection is directly contradicted by the fact that the legislature chose to create a program specifically to protect them. Indeed, the legislature has afforded protection to such claimants through the creation of the JUP.
        The dissent states that our holding would create an anomaly in the context of bad faith law in Hawaiʻi. Dissenting opinion at 10 n.9. But, based on the statutory language, the anomaly would be to extend bad faith protection to certificate policy holders, but deny the protections offered by the law of bad faith to insurance-needy assigned claimants, as the dissent would apparently hold. See dissenting opinion at 10. Rather, our holding is consistent with the requirement of fair and equal treatment for both certificate policy holders and assigned claimants, as demanded by the statutory scheme.

[21]     It appears, for example, that certain insurers under the JUP program are selected as "servicing carriers" to provide services on behalf of the JUP members and are reimbursed for their "servicing expenses" at certain rates. See HAR §§ 16-23-71 (1999); 16-23-78 (1999).

25

claimant's payment of premiums (since under the assigned claims program the claimant does not pay to have his or her claim assigned to an insurer), it would seem that insurance companies may have an economic incentive to deny or delay payment of assigned claims in order to avoid losses associated with such claims. The threat of a tort action serves to inhibit those incentives. As articulated in Best Place, allowing bad faith tort claims encourages companies to pay proceeds rightfully due to insureds. 82 Hawaiʻi at 132, 920 P.2d at 346. In any event, that the legislature intended to impose the same duties and obligations on insurers who are assigned claimants under the JUP, and that barring a bad faith tort action would undermine the statutory scheme, are enough to warrant allowing assigned claimants to pursue bad faith tort actions against insurers.

XI.

The ICA and Respondent, however, relied on Simmons v. Puu, 105 Hawaiʻi 112, 94 P.3d 667 (2004), reasoning that an insurance contract is a prerequisite to a claim of bad faith, and that because an assigned claim is not a "contract," Petitioner cannot sue Respondent under a bad faith tort theory. In Simmons, the petitioner was the driver of a vehicle struck by a rental car self-insured by Hertz. Id. at 115, 94 P.3d at 670. The petitioner alleged that the driver of the vehicle was negligent and ultimately asserted a claim of bad faith settlement practices against Hertz as the self-insurer of the rental vehicle. Id.

Hertz contended that there existed no common law claim for relief entitling third-party claimants such as the petitioner to sue self-insurers for bad faith settlement practices, inasmuch as Hertz was not an insurer and had no claims practices. Id. at 118, 94 P.3d at 673. This court agreed. Id. It was explained that a third party should not be permitted to enforce covenants not made for his or her benefit. Id. at 120-22, 94 P.3d at 675-77 (citing Murphy v. Allstate Ins. Co., 553 P.2d 584 (Or. Ct. App. 1976)). Because the duty to settle claims in good faith was intended to benefit the insured (the rental car driver) and not the injured claimant (petitioner), the third party beneficiary doctrine did not furnish a basis for the injured claimant to recover. Id.

This court further elaborated that the insurer was in a fiduciary relationship with the insured but was in an adversarial relationship to the third-party claimant (petitioner). Id. In meeting its duty to the insured, an insurer was required to give as much consideration to the insured's interest as it did to its own interest. Id. But the insurer had no such relationship with a third party. Id. This court adopted the assignment theory of common law third-party claims of bad faith settlement practices, which required the existence of a contractual relationship between an insurer and an insured as a predicate to establishing an injured claimant's right to sue a tortfeasor's insurer. Id. In other words, a third-party claimant could sue an insurer for bad faith settlement practices only if the insured assigned his

27

or her rights to the third party.[22]  Id.  The third party would in effect step into the shoes of the first-party beneficiary, to which the insurer owed a duty of good faith.  See id.

The reason for disallowing a bad faith tort claim in Simmons does not apply in this context.[23]  As noted, an insurance contract was held to be a prerequisite for a bad faith settlement claim in Simmons because, absent a contract between the third party and the insurer (or its equivalent -- an assignment of the first party's claim to the third party), the insurer owed no duty of good faith toward the third party.  Id.  Here, in contrast, as an assigned claimant, Petitioner stands in a first-party relationship to Respondent.

The assigned claims plan under the JUP creates an insurer-insured relationship, and under that plan, no underlying

_____

[22]    In Jou v. National Interstate Insurance Co. of Hawai'i, 114 Hawai'i 122, 157 P.3d 561 (App. 2007), the ICA held for similar reasons that a doctor who provided services to an employee covered by workers' compensation could not sue the workers' compensation carrier for bad faith.  The ICA noted that a workers' compensation scheme essentially created a three-party agreement between the employer, the employee, and the compensation carrier.  Id. at 133, 157 P.3d at 572 (citation omitted).  The ICA then explained that the purpose of workers' compensation was to compensate employees, not physicians.  Id. The ICA held that the doctor was an incidental beneficiary and not a third-party beneficiary of the workers' compensation scheme, and therefore could not assert a bad faith tort claim against the workers' compensation carrier.  Id. at 134, 157 P.3d at 573.  Further, the ICA noted, without deciding, that even assuming, arguendo, that the doctor could qualify as an intended third-party beneficiary, the special circumstances that warranted extending the tort of bad faith to insureds and injured employees, did not exist between a physician and a compensation carrier.  Id. According to the ICA, unlike a typical insured, a treating physician seeks commercial gain from the insurer rather than security, protection, and peace of mind.  Id.  In this case, the JUP program creates an insured-insurer relationship between the assigned claimant and the insurer, and the assigned claimant seeks the same security, protection, and peace of mind from the insurer that a policy-holder would.

[23]    Contrary to the dissent's argument, this opinion does not rely on Simmons, see dissenting opinion at 11-12, but distinguishes it.

contract is necessary to give rise to that relationship and its concomitant rights and obligations because that relationship is created by statute.[24]  See HRS § 431:10C-403 (stating that after an assigned claim is assigned to an insurer, the insurer is to have rights and obligations "as if it had issued motor vehicle mandatory public liability and property damage policies"). The statutory scheme requires insurers that are assigned claims to conduct their business as if there were in fact an underlying contract of insurance with a claimant.

An underlying contract, therefore, is not the sine qua non of a bad faith tort claim.  Cf. Best Place, 82 Hawaiʻi at 132, 920 P.2d at 346 ("The breach of the express covenant to pay claims, however, is not the sine qua non for an action for breach of the implied covenant of good faith and fair dealing.").  This view is supported by Enoka, 109 Hawaiʻi 537, 128 P.3d 850, which was decided in 2006, two years after Simmons.  In Enoka, the petitioner was in an accident while she was riding in another person's truck.  Id. at 541, 128 P.3d at 854.  The petitioner's parents owned three automobiles that were insured under a single

---

[24]    The dissent incorrectly claims that good faith cannot be implied without an underlying contract.  Dissenting opinion at 12 n. 11.  As noted before, in this situation, HRS §431:10C-403 establishes the equivalent of a policy contract by its terms, and HRS §431:1-102 reiterates a good faith requirement.  See discussion supra.  The dissent maintains bad faith rights are denied to the assigned claimant because "the singular requirement [of] an actual contract . . . [must] exist before good faith duties can be implied." Dissenting opinion at 12, n.11.  However, this view would contravene the fundamental requirement of good faith that underlies HRS chapter 431.  See HRS § 431:1-102 and HRS § 431:10C-403 (treating an assignee insurer "as if the assignee had written [a] motor vehicle insurance policy" to the individual claimant).

policy with AIG.  Id.  The petitioner was a named insured under a different policy with GEICO.  Id.  Three years after the accident, the petitioner filed a claim for no-fault benefits under the AIG policy.  Id. at 542, 128 P.3d at 855.  AIG denied the claim.  Id.  This court stated that an exclusion in AIG's policy for family members who are named insureds under another no-fault policy (here GEICO) clearly applied to the petitioner, and thus ostensibly the petitioner was not entitled to coverage under the AIG policy.  Id. at 548, 128 P.3d at 861.

However, this court also held that an insured could bring a bad faith tort claim against an insurer even when the insurer had no contractual duty to pay benefits to the insured based on the clear and unambiguous language of an insurance policy.  Id. at 552, 128 P.3d at 865.  Thus, this court allowed the petitioner to sue AIG for bad faith mishandling of the insurance claim.  Id.  It was reasoned that an insurer must act in good faith in dealing with its insured and in handling the insured's claim, even when the policy clearly and unambiguously excluded coverage.  Id.  Accordingly, the trial court had erred in determining that because the insured's breach of contract claim failed, her bad faith claim must also fail.  Id.

Enoka's reasoning does not support the proposition that the duty of good faith owed by the insurer to the insured is dependent on the existence of a contract.  If the contract is the source of the duty to act in good faith, then mishandling or denying a claim when the insurer has no contractual duty to pay

30

benefits should not give rise to a bad faith claim. Indeed, in Enoka, the insurer argued that in the absence of a contractual duty to pay benefits, there was no implied covenant of good faith and fair dealing to breach and, thus, no action for bad faith. Id. at 549, 128 P.3d at 862. Yet, this court held that the tort of bad faith did not turn on whether the claim for benefits was due or not; instead, it turned on "the conduct of the insurance company in handling the claim." Id. at 551, 128 P.3d at 864. For, "[s]urely[,] an insurer must act in good faith in dealing with its insured and in handling the insured's claim, even when the policy clearly and unambiguously excludes coverage." Id. (emphases added). The special relationship between the insurer and the insured and the conduct of the insurer toward the insured is what gives rise to the tort of bad faith, not solely the existence of a contract.[25] See id.

The ICA came to the same conclusion in Christiansen v. First Insurance Company of Hawaiʻi, Ltd., 88 Hawaiʻi 442, 449, 967 P.2d 639, 646 (1998), stating that the tort of bad faith in the first-party insurance context "is unconditional and independent of [the insured's] contractual obligations." (Emphasis and brackets in original.) (Internal quotation marks and citation

---

[25] Respectfully, the dissent does not distinguish Enoka as to its holding, but states the obvious, that Enoka did not "address . . . a statutorily created relationship without a contract." Dissenting opinion at 17. However, Enoka is cited for recognizing that an insurer's good faith duty does not rest only in coverage under the insurance policy, but extends to the relationship between insured and insurer. See 109 Hawaiʻi at 549, 128 P.3d at 862. Although the dissent suggests otherwise, dissenting opinion at 14-16 n.13, as noted, Enoka recognized duties outside the contractual relationship.

omitted.)  The issue in Christiansen was whether an action for
bad faith was "on the policy" such that a statute of limitations
provision in the policy would apply to the bad faith action.  Id.
at 450-51, 967 P.2d at 647-48.  The ICA explained that
jurisdictions were split on the question, and that some
jurisdictions had ruled that because the alleged tortious conduct
of the insurer arises out of its obligations under the provisions
of the policy, an action for the bad faith handling of an
insurance claim was governed by the limitation provision in the
policy.  Id.  Those jurisdictions had concluded that since,
absent the insurance contract, "there would be no legal
relationship between the parties[,] [the insurer] could not be
guilty of acting in bad faith."  Id.

     The ICA rejected the rationale of those jurisdictions
as inconsistent with Best Place.  Id. at 451-52, 967 P.2d at 648-
49.  The ICA explained that in Best Place this court had
clarified that "an insurer's duty of good faith and fair dealing
[is] one implied by law that is independent of the performance of
the insured's contractual obligations."  Id. at 451, 967 P.2d at
648.  The ICA stated that "a tort of bad faith is a tort
independent of the policy because its origins are not in the
contract but in the common law imposition of good faith and fair
dealing, the breach of which fiduciary duty may be considered an
independent tort."  Id. at 452, 967 P.2d at 649 (emphasis added).
Thus, the ICA held that the bad faith tort action is not "on the

policy" and cannot be governed by the policy's limitation provision.[26]  Id.

In light of Christiansen and Enoka,[27] the ICA's reliance on Simmons for the proposition that a contract is a prerequisite to a bad faith claim is incorrect.  As discussed above, the insurer had no duty toward the petitioner in Simmons because the petitioner was the victim of the accident, not the insured, and the insurer owed no duty of good faith to a third-party victim.  105 Hawaiʻi at 120-22, 94 P.3d 675-77.  In this case, Petitioner is the insured.  To hold that Respondent owes no duty of good faith to its own insured because the insurer-insured relationship is created by statute instead of by contract would be an unwarranted departure from this court's post-Simmons holding in Enoka that the insurer must act in good faith in dealing with its insured and in handling the insured's claim, even in the absence of a contractual obligation owed the insured.  Enoka, 109 Hawaiʻi at 552, 128 P.3d at 865.  Likewise, to hold that the insurer does have a duty of good faith toward its insured but that a tort of bad faith does not lie because the insured lacks a contract would be to recognize a duty that cannot be enforced.  Such a result is not contemplated by cases such as

_____

[26]  Again, the dissent's assertion, that Christiansen, like Enoka, is not relevant because no written contract exists here, is subject to the same refutation -- that the statutes involved in the instant case indicate that an automobile insurance policy should be deemed to exist.

[27]  These cases are pertinent as they exemplify situations in which the contract was not central to the case but the court recognized duties outside of the express language of the contract.

33

Best Place, Enoka, and Christiansen, and does not follow from Simmons, which held only that a third party, to whom a tortfeasor's insurer owes no duty, could not bring a claim of bad faith settlement practices.[28]

## XII.

There are contexts, however, in which the existence of a contract does affect whether or not it is possible to bring a claim. For example, in Willis II, this court held that Petitioner could not seek attorneys fees under HRS § 431:10C-211(a) (Supp. 1997), which provides in relevant part that

> [a] person making a claim for personal injury protection benefits may be allowed an award of a reasonable sum for attorney's fees, and reasonable costs of suit in an action brought by or against an insurer who denies all or part of a claim for benefits under the policy . . . .

113 Hawai'i at 250, 151 P.3d at 731.

This court stated that the denial of an assigned claim did not qualify as the denial of a claim under a policy because assigned claims are creatures of statute and do not arise out of a contractual relationship. Id. at 249, 151 P.3d at 730. To the

---

[28] The parties also cite to Mendes v. Hawai'i Insurance Guaranty Assn., 87 Hawai'i 14, 950 P.2d 1214 (1998). In that case, an insured sued the Hawai'i Underwriters Insurance Company (HIGA), a non-profit, unincorporated legal entity created by HRS Chapter 431, Article 16, in order to provide a mechanism for the payment of covered claims when an insurer becomes insolvent. Id. at 17, 950 P.2d at 1217. This court held that HIGA could be sued for its failure to cover a claim, but that it was immune to a bad faith claim, pursuant to HRS § 431:16-116 (1993), which provided that there "shall be no liability on the part of and no cause of action of any nature shall arise against . . . the association . . . for any action taken by them in the performance of its duties." Id. at 18, 950 P.2d at 1218. This court held that the legislature had made a policy determination to limit HIGA's liability because HIGA was not a traditional, for-profit insurance company, and therefore no bad faith claim could lie against HIGA. Id. There is no statute that limits Respondent's liability pursuant to the JUP. Therefore, Mendes does not resolve whether Petitioner can bring a bad faith claim against Respondent.

34

contrary, as noted above, HRS § 431:10C-403 explicitly provides that Respondent has the "same rights and obligations" with regard to Petitioner's assigned claim as would an insurer that issued a policy providing such coverage. It was explained in Willis II that whereas the legislature announced that a certificate policy was to be deemed a policy for purposes of the Insurance Code, the legislature did not similarly categorize assigned claims, and therefore an assigned claim was not a "policy" for purposes of HRS § 431:10C-211(a). 113 Hawaiʻi at 249-50, 151 P.3d 730-31.

In this case, the ICA decided that because this court determined in Willis II that Petitioner's claim was not contractual in nature, Petitioner's claim could not be treated as a policy for purposes of bringing a tort claim either. Willis III, 126 Hawaiʻi at 316, 270 P.3d at 1046. But Willis II is not dispositive of Petitioner's tort claim. As noted, in Willis II, this court said that an assigned claim was not a policy for purposes of the attorneys' fees statute because an assigned claim was not a contract and the legislature had chosen to treat certificate policies and assigned claims differently. 113 Hawaiʻi at 249-50, 151 P.3d 730-31.

However, as noted herein, the statutory scheme treats certificate policies and assigned claims equally for purposes of an insurer's rights and duties to the insured. HRS § 431:10C-402(a) provides, "The commissioner shall establish and maintain a joint underwriting plan bureau in the insurance division to receive, assign and supervise the servicing of all assigned

35

claims and all applications for joint underwriting plan coverage." (Emphasis added.) "[A]pplications for joint underwriting plan coverage" refers to certificate applications, while "assigned claims" refers to the assigned claims program under the JUP. Compare HRS § 431:10C-407 (discussing applicants for certificate policy), with HRS § 431:10C-408 (discussing assigned claims). As noted, in the very next sentence in HRS § 431:10C-403, the legislature specified that the bureau "shall promptly assign each claim and application, and notify the claimant or applicant of the identity and address of the assignee of the claim or application." To reiterate, "[t]he assignee, thereafter, has rights and obligations as if it had issued motor vehicle mandatory public liability and property damage policies . . . ." Id. The legislature thus intended for insurers to have duties coincident with issuing a policy for both certificate applications and assigned claims.[29]

XIII.

Respondent, however, argues that a claimant under the

___

[29] In sum, the common law duty of good faith and fair dealing of insurers is incorporated in the insurance code. See HRS § 431:1-102 ("The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith[.]"). Hence, the dissent is wrong in claiming that this decision "depart[s] from fundamental common law principles" with respect to the bad faith doctrine. See dissenting opinion at 13. To repeat, the legislature has further expressed its intent to specifically impose the same duty of "good faith" upon insurers who adjust assigned claims where no contractual relationship exists as that imposed on insurers who adjust contract based policies. See HRS § 431:10C-403. This decision thus effectuates legislative intent. Correlatively, this decision is consistent with established case law. Although not applying a statute, Best Place, Enoka, and Christiansen rest on the principle of a good faith obligation in the insurer-insured relationship, as set forth in this opinion. This decision recognizes the statutory relationship of good faith, HRS § 431:1-102, between an insurer and insured underlying HRS § 431:10C-403.

assigned claims program is "a person for whom '[n]o insurance benefits under motor vehicle insurance policies are applicable[.]'"  (Quoting HRS § 431:10C-408(a)(1) (1998).) Stated differently, "[Respondent maintains] there is no basis for [Petitioner] to contend that she is a policyholder to whom benefits under an insurance policy have been denied and there is no basis for [Petitioner] to pursue her alleged 'bad faith' claim against [Respondent]."  It appears that Respondent interprets a person for whom "no insurance benefits under motor vehicle insurance policies are applicable," HRS § 431:10C-408(a)(1), as requiring Petitioner to show that benefits have been "denied" to her under an existing policy.

The evidence in this case is that no insurance benefits were applicable to Petitioner at the time of the accident.  As noted, although Petitioner had a certificate policy from July 2, 1998 through July 2, 1999, the policy did not include uninsured motorist coverage.  The fact that the JUP Bureau determined that Petitioner was entitled to receive benefits under the JUP confirms that the agency that administers the JUP also believed that Petitioner satisfied HRS § 431:10C-408(a)(1).  Respondent provides no authority for the proposition that Petitioner would not qualify under HRS § 431:10C-408(a)(1) because she cannot show that she is a person to whom "benefits under an insurance policy have been denied."  On its face, HRS § 431:10C-408(a)(1) is met if no benefits under a policy are applicable to the accidental

37

harm.  Thus, Respondent's interpretation of HRS §

431:10C-408(a)(1) is not supported by the statutory language.[30]

## XIV.

Respondent also argues that this court has already

implicitly rejected Petitioner's bad faith tort claim because

this court only remanded in <u>Willis I</u> for a determination of

benefits due pursuant to the assigned claim.  Respondent's

argument is, in essence, that this court implicitly denied

Petitioner's bad faith claim by not saying anything about that

claim when it remanded in <u>Willis I</u>.  The exact language of this

court's remand in <u>Willis I</u> was:

> In light of the foregoing analysis, we hold that the circuit
> court erred in awarding summary judgment in favor of
> [Respondent] and against [Petitioner].  Accordingly, we
> vacate the circuit court's July 2003 judgment insofar as it
> dismissed [Petitioner]'s action against [Respondent] remand
> for further proceedings consistent with this opinion.  On
> remand, to the extent that the trier of fact finds that
> [Petitioner]'s post-July 2, 1999 medical expenses remain
> unpaid and her assigned claim complies with the Motor
> Vehicle Insurance Law in other respects, the circuit court
> shall order [Respondent] to tender the appropriate benefits
> under the assigned claims program.

112 Hawaiʻi at 191, 145 P.3d at 734.  This language cannot

---

[30] At oral argument, Respondent took a slightly different position, arguing that HRS § 431:10C-408 is only satisfied if a person has no "identifiable" benefits under any motor vehicle policy, and that because Petitioner had a certificate policy at the time of the accident, she had "identifiable" benefits.  However, again, Respondent's interpretation is not supported by the language of the statute.  HRS § 431:10C-408(a)(1) applies to persons when "[n]o insurance benefits under motor vehicle insurance policies are <u>applicable</u> to the accidental harm[.]" (Emphasis added.)  As noted, there is no question in this case that no insurance benefits under a motor vehicle insurance policy were applicable to Petitioner at the time of the accident because her certificate policy provided no coverage for the accidental harm as it lacked uninsured motorist coverage.  HRS § 431:10C-408(a)(2), the section that contains the word "identified" (but which was not cited by Respondent in its Response when making this argument) is satisfied if "no such insurance benefits <u>applicable</u> to the accidental harm can be identified." (Emphasis added.)

reasonably be construed to resolve the rest of Petitioner's claims. As explained, in <u>Willis I</u>, the court had entered summary judgment in favor of Respondent because it had found that Petitioner was not due benefits under the assigned claim. This court noted that the court had also disposed of the rest of the claims in the lawsuit, "<u>none of which is germane to this appeal</u>." <u>Id.</u> at 188 n.8, 145 P.3d at 731 n.8 (emphasis added). This court then vacated the court's judgment "insofar as it dismissed [Petitioner's] action against [Respondent.]" <u>Id.</u> at 191, 145 P.3d at 734. In other words, the court's judgment was vacated insofar as it dismissed the entirety of Petitioner's action against Respondent, which would include her bad faith claim. This court's silence as to what should happen on remand to the rest of Petitioner's claims that were not at issue in <u>Willis I</u> (and therefore not before this court) suggests only that the court would have to decide those claims on remand, not that this court silently and without explanation denied those claims.

XV.

Because we hold that Petitioner can bring a bad faith tort claim, the question of whether it was proper for the court to enter summary judgment on behalf of Respondent on the merits of Petitioner's bad faith claim remains. As noted, the ICA did not decide the question because it held that Petitioner could not, as a matter of law, assert a bad faith tort claim. <u>Willis III</u>, 126 Hawaiʻi at 315-17, 270 P.3d at 1045-47.

39

On appeal, an order of summary judgment is reviewed under the same standard applied by the trial courts. Wong-Leong v. Hawaiian Indep. Refinery, Inc., 76 Hawaiʻi 433, 438, 879 P.2d 538, 543 (1994). Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Reed v. City & Cnty. of Honolulu, 76 Hawaiʻi 219, 225, 873 P.2d 98, 104 (1994). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Pac. Int'l Servs. Corp. v. Hurip, 76 Hawaiʻi 209, 213, 873 P.2d 88, 92 (1994).

In Best Place, this court articulated the applicable standard for a first-party bad faith claim as follows:

> [T]he insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages . . . . However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. . . .

82 Hawaiʻi at 113, 920 P.2d at 347. Further, "where an insurer denies the payment of no-fault benefits based on an 'open question of law,' there is 'obviously no bad faith on the part of [the insurer] in litigating that issue.'" Enoka, 109 Hawaiʻi at 552, 128 P.3d at 865.

The court concluded that Willis I had settled an open question of law, and therefore Respondent's denial of

40

Petitioner's benefits was not in bad faith. Petitioner argues, however, that this court's language in Willis I suggests that Respondent's legal basis for denying Petitioner's claim was not reasonable. As noted, in Willis I, Petitioner had argued that she qualified for an assigned claim because there was no other insurance that she could turn to and the legislature intended for her to be covered. 112 Hawaiʻi at 189, 145 P.3d at 732. Respondent countered that Petitioner did not qualify for assigned claims coverage because she was the named insured under her own certificate policy at the time of the accident, and therefore had "identifiable" motor vehicle insurance coverage on the date of the subject accident. Id.

Respondent cited to HRS § 431:10C-408(a), which provides that a person may seek coverage under the assigned claims program when no insurance benefits under motor vehicle insurance policies are applicable to the accidental harm or no such insurance benefits can be identified. Id. at 189, 145 P.3d at 732. Respondent argued that certificate policies were not required to include uninsured motorist coverage in order to comply with the statutory scheme, and that Petitioner had disregarded a prior offer Respondent had made to Petitioner to add uninsured motorist coverage to her certificate policy, and that by disregarding Respondent's offer, Respondent forewent her eligibility for assigned benefits. Id.

This court explained that the "core issue as framed by the parties [was] whether an offer and a tacit refusal of UM

41

coverage rendered the UM coverage 'applicable' and 'identifi[able]' so as to relieve the assignee insurer under HRS § 431:10C-408, [] of the duty to compensate the injured claimant."[31] Id. However, this court held that it did not have to decide that issue because Respondent had not "offered" uninsured motorist coverage to Petitioner but had, at most, made an invitation to initiate negotiations. Id. at 190, 145 P.3d at 733. It was explained that "[a]t most, [Respondent had] flagged for [Petitioner] the fact that no statute or regulation bestowed an [uninsured motorist] component on her certificate policy . . . ." Id. This court stated, "[n]o reasonable reading of the statement [made by Respondent to Petitioner] could elucidate (1) which insurer(s) might underwrite [Petitioner's uninsured motorist] coverage or (2) the premiums or any other terms." Id. (footnote omitted) (emphasis added).

This court also explained that Respondent had argued, on public policy grounds, that if Petitioner's argument were accepted, there would be universal uninsured motorist coverage for anyone insured in a motor vehicle accident, and that there would be no point in paying a premium for uninsured motorist coverage if all one had to do was to apply to the JUP at no cost.

---

[31] In other words, if Petitioner had applicable coverage at the time of the accident, she would not have qualified for an assigned claim because not having applicable insurance coverage is a precondition for an assignment claim. See HRS § 431:10C-408(a) ("Each person sustaining accidental harm, or such person's legal representative, may . . . obtain the motor vehicle insurance benefits through the plan whenever: (1) No insurance benefits under motor vehicle insurance policies are applicable to the accidental harm; (2) No such insurance benefits applicable to the accidental harm can be identified . . . .").

Id. at 191, 145 P.3d at 734. Thus, Respondent's argument "distort[ed]" Petitioner's characterization of the assigned claims program. Id. The assigned claims program applied only in residual situations. Id. This court stated that the "absurd consequence" of Respondent's argument would be that insurers, merely by offering, could compel even those who do not own cars to purchase uninsured motorist coverage. Id.

As noted, this court characterized Respondent's arguments on this particular issue as "unreasonable" and "absurd." Indeed, it was held that there was no need to resolve the core issue -- the question of whether an offer and a tacit refusal of uninsured motorist coverage rendered certificate coverage applicable so as to relieve an assignee insurer of the duty to compensate the injured claimant, because the case could be resolved as a matter of law on the ground that Respondent had not made an offer to Petitioner. Therefore, Willis I did not resolve an "open question of law" posed by the parties and, consequently, the court's grant of summary judgment to Respondent on the ground that this court resolved an open question of law was wrong.

XVI.

In general, whether an insurer has acted in bad faith is a question of fact. See Guajardo v. AIG Hawaiʻi Ins. Co., 118 Hawaiʻi 196, 206, 187 P.3d 580, 590 (2008) ("allegations of bad faith between insurer and insured over fair dealing and meaning of policy were 'exactly the type of issue[s], under Best Place,

43

that the jury should consider, and one[s] that should not be made by the court[.]'") (citation omitted).  This court has held that "reasonableness can only constitute a question of law suitable for summary judgment 'when the facts are undisputed and not fairly susceptible of divergent inferences,' because, 'where, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury.'"  Id. (quoting Courbat v. Dahana Ranch, Inc., 111 Hawaiʻi 254, 263, 141 P.3d 427, 436 (2006)) (citations and brackets omitted).

In Guajardo, this court held there was a disputed issue of material fact concerning whether the insurer had refused to settle in good faith.  Id.  Further, this court explained that although the ICA had reasoned that there was an open question of law that precluded finding the insurer had acted in bad faith, there was "no mention of an 'open question of law' as a basis for [the insurer's] initial outright rejection of the possibility of a settlement, and, in any event, genuine issues of material fact regarding the reasonableness and good faith of [the insurer's] interpretation of its policy remain, wholly separate and apart from the applicability of [case law.]"  Id.; see also Smith v. Safeco Ins. Co., 78 P.3d 1278 (Wash. 2003) (stating that "[t]he existence of some theoretical reasonable basis for the insurer's conduct does not end the inquiry" into whether or not the insurer acted in bad faith, and that "[t]he insured may present evidence that the insurer's alleged reasonable basis was not the actual

44

basis for its action, or that other factors outweighed the alleged reasonable basis").

Petitioner argues that a fair-minded jury may find that it was unreasonable for Respondent to premise its denial of coverage on a legally invalid offer, to the extent that experienced claims adjusters should know better than to rely on faulty and insufficient offers as a basis to deny statutory benefits. Petitioner's expert had also averred that, in his professional opinion, Respondent acted in bad faith in delaying payment of benefits to Petitioner and in failing to properly investigate Petitioner's claim. According to the expert, it was common knowledge and understood within the insurance industry that a certificate policy does not negate an assigned claim. Petitioner's expert also opined that Respondent owed Petitioner a duty of good faith as the insurance company that was assigned to adjust the JUP assigned claim, and that to the extent that the JUP

> operates as an insurance relief measure and is a substitute
> to the mandated automobile bodily injury requirements of the
> State of Hawaiʻi, [Respondent's] duty of good faith and fair
> dealing arises from [its] assigned role as a servicing
> carrier and an insurer under the [JUP], and as such does not
> depend, necessarily, on whether [Petitioner] was a party to
> any written contract.

Respondent did not provide any affidavits to counter Petitioner's expert's statement.[32]

---

[32] In support of its motion for summary judgment, Respondent attached only a copy of Willis I and some documentation to establish that it had paid Petitioner all of the benefits due to her under the assigned claim. Respondent also attached a declaration to its Reply to Petitioner's Supplemental Legal Memorandum which stated that Petitioner had not provided
(continued...)

Petitioner's affidavits raise questions of fact for a fact finder about whether Respondent's reliance on a faulty offer was in bad faith and whether Respondent's conduct fell below that of a reasonable insurance adjuster.  Thus, summary judgment for Respondent was wrongly granted.[33]

XVII.

We therefore vacate the judgments entered as aforesaid and remand to the court for proceedings consistent with this opinion.[34]

| | |
|---|---|
| Fernando L. Cosio, for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Bradford F.K. Bliss, for respondent | /s/ Simeon R. Acoba, Jr. |
| | /s/ Sabrina S. McKenna |



---

[32](...continued)
proof of her medical expenses for treatment after January 26, 2006.  However, it appears that Respondent did not attach any affidavits to counter Petitioner's expert opinion that the facts suggested Respondent acted in bad faith.

[33]     On remand, the court should address Petitioner's June 8, 2007 motion to compel Respondent to answer Petitioner's interrogatories and to respond to Petitioner's requests for production of documents, which the court denied as moot upon granting Respondent's motion for summary judgment.

[34]     We respectfully cannot agree with Judge Chang's dissent, but appreciate his eloquent and gracious opinion.